## Richmond

FIDELITY BANKERS LIFE INSURANCE CORPORATION v. SHIRLEE COLBY WHEELER.

April 23, 1962.

Record No. 5397.

Present, All the Justices.

*Alan G. Fleischer (Miles Cary, Jr.; Hirschler, Fleischer & Sadler,* on brief), for the plaintiff in error.

*William P. Hanson (Benjamin G. Hanson; Hanson & Hanson,* on brief), for the defendant in error.

WHITTLE, J., delivered the opinion of the court.

Mrs. Wheeler filed a motion for judgment in the trial court against Fidelity Bankers Life Insurance Corporation for the sum of $3,012,

which she alleged was due her as beneficiary under a life insurance policy issued by the insurance company on February 7, 1959, under which policy Alan Ross Harris, who died on February 22, 1959, was the insured.

The insurance company filed responsive pleadings to the motion denying liability under the policy, alleging that Harris concealed and misrepresented material facts in his application for the insurance.

There was a jury verdict in favor of the plaintiff in the amount sued for, whereupon the insurance company moved the court to set aside the verdict and enter final judgment in its favor upon the grounds that the verdict was contrary to the law and the evidence and without evidence to support it. The motion was overruled and judgment entered upon the verdict. We granted the company a writ of error.

The sole question involved, which will be hereinafter stated, brings under review § 38.1-336, Code of 1950, 1953 Replacement Volume, which reads:

"WHEN ANSWERS OR STATEMENTS OF APPLICANT NOT TO BAR RECOVERY ON POLICY.—All statements, declarations and descriptions in any application for a policy of insurance or for the reinstatement thereof shall be deemed representations and not warranties, and no statement in such application or in any affidavit made before or after loss under the policy shall bar a recovery upon a policy of insurance, or be construed as a warranty, anything in the policy to the contrary notwithstanding, unless it be clearly proved that such answer or statement was material to the risk when assumed and was untrue."

The trial court instructed the jury, without objection, that the answers or statements contained in the application were untrue, thus leaving the only question to be decided: Were the statements material to the risk when assumed?

The questions involved in the application were A8 and A10(i), which questions and answers follow:

"A8.     When did you last consult a physician or practitioner? Feb. 1958
Name of physician or practitioner?  Forgotten
Address of physician or practitioner?  Paris Island, S. C.
Illness?  Normal Discharge USMC
Details?  Found Normal
"A10(i).  Have you consulted any physicians or practitioners the

·past five years for any other causes?
No."

The record discloses that Harris had consulted Dr. Jacob J. Hladys, at his office in Richmond, on November 14, December 5, 12, 19, 23, 26 and 30, in 1958; January 9, 16, 23, 30, February 2, 6, 10, 13, and 20, in 1959. Thus, between November 14, 1958 and January 28, 1959, the date of the application, Harris had visited Dr. Hladys ten times, and after the application saw him an additional six times, the last visit being on February 20, 1959, which was two days prior to his death. In addition to this, he had been receiving psychiatric treatment while a member of the United States Marine Corps for about a year and a half, and had also consulted a Dr. Masters at Tucker Hospital in Richmond.

A summary diagnosis of Harris' illness was set forth in a letter from Dr. Hladys on July 20, 1960 (Plaintiff's Exhibit 2) as follows:

"Diagnosis—Psychoneurosis, Anxiety type, Mild.

Treatment—Psychotherapy 1-1½ hours. No medication was necessary: Was receiving Psychiatric treatment at time of death—February 22, 1959."

Additional facts testified to by Dr. Hladys were: Harris was referred to him by Dr. Hodges, associate pastor at First Baptist Church. Dr. Hodges felt Harris was seclusive, withdrawn, shy, extremely nervous and needed psychiatric help.

Dr. Hladys' findings were summarized as follows:

"Well, his symptoms when he came to me were symptoms of nervousness, anxiety, and tension, feelings of insecurity, feelings of inferiority and depression, and having a tendency to be by himself, being uncomfortable around people, and hating his father and mother. * * * Harris' make up is a picture of what we call a schizoid type of personality."

The characteristics outlined by Dr. Hladys were largely corroborated by the plaintiff and one of her witnesses, John C. Crawford, a friend of Harris.

In answer to a question propounded by the court Dr. Hladys said that with a person like Harris "you are always faced with the factor that the patient in his condition could commit suicide;" that his chances for a satisfactory marriage were "impossible" without adequate treatment, and that "he would not ever have been able to live a normal life."

Dr. Robert M. Miskimon, the Underwriting Vice President and

Medical Director for the insurance company, testified that an essential part of the underwriting information in determining whether or not the policy should be written was the application, particularly since no medical examination was required; that there was nothing in the application or any other paper before the company "which in any way reveals that Alan Harris was under treatement with Dr. Jacob J. Hladys;" that if the name of Dr. Hladys had been revealed in the answers to Questions A8 and A10(i) the policy would not have been issued "without first contacting Dr. Hladys for a report;" that had he known about Dr. Hladys and the numerous visits Harris had paid to him wherein the condition had been diagnosed "Psychoneurosis, Anxiety type, Mild" he would not have issued the policy at the present time, but rather would have waited about a year; that the reason he would have declined to issue the policy at the present time was "because of the increased mortality of people who have this situation, this condition."

The evidence further disclosed that had the company issued the policy at all, an extra premium would have been charged to cover "what we thought would be the extra mortality rating," which "would probably be at least twice the usual mortality."

In addition to Dr. Miskimon's testimony, Dr. Ennion S. Williams, Vice President and Medical Director of the Life Insurance Company of Virginia, and Raymond G. Cleek, Chief Underwriter and Assistant Secretary of Atlantic Life Insurance Company, testified, without objection, that under no circumstances would their companies have written the policy before receiving a statement from Dr. Hladys concerning his treatment of Harris, and that had the policy been issued at all it would have been "double the mortality rating."

There was no evidence introduced by the plaintiff to refute the foregoing testimony and since, as aforesaid, the trial court properly instructed the jury that the answers to the questions were untrue, the only remaining question was whether or not it had been clearly proved that such answers were material to the risk when assumed, as required by Code, § 38.1-336, 1953 Replacement Volume.

We hold that the record discloses, without contradiction, that the answers were material to the risk, and the motion to strike plaintiff's evidence should have been sustained. As said in *Inter-Ocean Ins. Co.* v. *Harkrader* (1951), 193 Va. 96, 100, 101, 67 S. E. 2d 894, 897:

"Representations in an application for a policy of insurance should not only be true but full. The insurer has the right to know the whole truth. If a true disclosure is made, it is put on guard to make its own

inquiries, and determine whether or not the risk should be assumed. A misstatement of material facts by the applicant takes away its opportunity to estimate the risk under its contract. A knowledge or ignorance of such facts would naturally and reasonably influence the judgment of the insurer in making the contract or in establishing the degree or character of the risk or in fixing the rate of premium." (Citing an array of Virginia cases.)

In the instant case, the failure to truthfully answer Questions A8 and A10(i) deprived the insurance company of the opportunity of making even a basic estimate of the risk involved.

As stated in Vance, Law of Insurance (Anderson 3rd Ed. 1951) Section 62, page 376:

"If the knowledge of a fact would cause the insurer to reject the risk, or to accept it only at a higher premium rate, that fact is material, though it may not even remotely contribute to the contingency upon which the insurer would become liable, or in any wise affect the risk."

See also *Standard Accident Ins. Co.* v. *Walker* (1920), 127 Va. 140, 147, 102 S. E. 585; *Flannagan* v. *Northwestern Mutual Ins. Co.* (1929), 152 Va. 38, 68, 146 S. E. 353.

Plaintiff relies upon our decision in *Scott* v. *State Farm Mutual* (1961), 202 Va. 579, 118 S. E. 2d 519. The *Scott* case, contrary to plaintiff's interpretation, supports our conclusion in the instant case. At page 583 in the *Scott* case, we distinguish it from the holding in *Didlake* v. *Standard Ins. Co.* (10th Cir., 1952), 195 F. 2d 247, 33 A. L. R. 2d 941. There we said:

"* * * (E)vidence was introduced [in the *Didlake* case] on behalf of the insurance company that it would not have issued the policy if it had known that the true owner of the car was a minor, unmarried, and away from home on duty with the Army, since he would have been considered a bad risk."

At page 584, the opinion in the *Scott* case continues:

"In each of the Virginia cases hereinbefore cited supporting the principle that a misrepresentation of facts material to the risk voids an insurance contract, there was positive proof that the company would not have written the policy if it had known the true facts."

It will be seen that in the *Scott* case the insurance company presented no evidence that it would have rejected the risk or charged a higher premium if it had been revealed in the application that the true owner of the car was a minor.

In the instant case there is positive proof that the insurance com-

pany would not have issued the policy had it known the true facts, and this evidence is not controverted. Thus the question of materiality became one of law for the court. *Inter-Ocean Ins. Co.* v. *Harkrader*, *supra*, 193 Va., at page 102, 67 S. E. 2d, at page 898.

For the reasons stated the verdict is set aside, the judgment reversed and final judgment entered here for the insurance company.

*Reversed and final judgment.*